*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

THOMAS J. O'BRIEN, JR.,

      Plaintiff-Appellee,

v

ANN MARIE D'ANNUNZIO,

      Defendant-Appellant.

UNPUBLISHED
February 27, 2020

No. 347830
Oakland Circuit Court
Family Division
LC No. 2004-693882-DC

Before: MURRAY, C.J., and SAWYER and GLEICHER, JJ.

GLEICHER, J. (*dissenting*).

Defendant-mother Ann Marie D'Annunzio has not parented her children in more than two years. Mother has not been adjudged unfit, and no evidence in the voluminous record even hints at unfitness. Without benefit of an evidentiary hearing and based on unsubstantiated allegations reinforced by improper off-record communications, the trial court suspended Mother's parenting time. Fifteen months elapsed before the trial court rendered an opinion stripping Mother of custody and denying her any opportunity to visit or communicate with her children.

The lead opinion affirms, characterizing the trial court's multiple, serious legal errors as "harmless." I respectfully disagree for three reasons: several of the errors were egregious and far from harmless; the great weight of the evidence contravenes many of the trial court's findings; and the trial court abused its discretion by depriving Mother of parenting time. Rather than working toward reunifying this family, the record substantiates that the trial court displayed an unbridled animosity toward Mother and likely will never allow her to regain even the barest contact with her children. I would remand for entry of an order requiring immediate efforts at reunification conducted by a therapist selected from outside the court, and prompt reassignment to a new judge.

I

Certain fundamental legal principles faded into the background during this protracted and contentious case. First and foremost:

Parenting time shall be granted in accordance with the best interests of the child. *It is presumed to be in the best interests of a child for the child to have a strong*

-1-

*relationship with both of his or her parents.* Except as otherwise provided in this section, *parenting time shall be granted to a parent in a frequency, duration, and type reasonably calculated to promote a strong relationship between the child and the parent granted parenting time.* [MCL 722.27a(1) (emphasis added).]

The right to parenting time may be withdrawn only when clear and convincing *record* evidence demonstrates that parenting time "would endanger the child's physical, mental, or emotional health." MCL 722.27a(3) (emphasis added). The meaning of these legislative commands cannot be emphasized strongly enough. Children have the best chance to grow into healthy adults when they have relationships with *both* parents. Depriving a child of a parent, and a parent of a child, is a drastic measure that should be undertaken only under the direst circumstances, and in a process that strictly conforms with the rules. This case comes nowhere close to fulfilling those prerequisites.

Second, our Legislature has enacted a statutory framework designed to protect parents' due process rights in custody disputes. One such procedure, MCL 722.27(1)(c), empowers a circuit court to "modify or amend" previous judgments or orders conditioned on a showing of proper cause or changed circumstances. Our Supreme Court has described as "critical" that courts "carefully and fully comply with the requirements of MCL 722.27(1)(c) before entering an order that alters a child's established custodial environment." *Daly v Ward*, 501 Mich 897, 898; 901 NW2d 897 (2017). In *Daly*, Supreme Court emphasized that a child's established custodial environment should not be changed absent "clear and convincing evidence" that doing so "is in the best interests of the child." *Id*. The Supreme Court highlighted that "[t]his heightened evidentiary burden for altering a child's established custodial environment recognizes the commonsense proposition that a child benefits from the permanence and stability of an established custodial environment, and therefore that such an environment should not lightly be altered." *Id*. Although a trial court may enter an order upsetting a child's established custodial environment ex-parte, it may not do so "without first making the findings required by MCL 722.27(1)(c)." *Id*.

The Supreme Court issued its order in *Daly* on October 13, 2017. The trial court in this case entered a temporary order changing the children's established custodial environment and suspending Mother's parenting time on November 6, 2017, without holding or even scheduling an evidentiary hearing. The order reflects that the "evidence" on which the court relied was an "interview[]" it conducted with Father off-the-record. Based solely on Father's unsubstantiated allegations, the order prohibited Mother from "appearing at the children's school" or having any contact with the children "in any fashion." On November 15, again without taking a shred of evidence or making the requisite findings, the court "extended" its November 6 order. These orders defied *Daly*. And they produced lasting and tragic consequences.

This case exemplifies what happens when a trial court ignores the rules. Without benefit of a hearing, the trial court unhesitatingly accepted inflammatory and, as the actual evidence later revealed, exaggerated or false allegations set forth in an emergency motion. From the moment the trial court took away Mother's right to have a relationship with her children, Mother was on the defensive. She was forced to refute or rebut allegations that had never been verified with admissible evidence or tested with cross-examination. And yet the trial court dug in, finding fault with virtually every attempt Mother made to reestablish a relationship with her children. By denying Mother any parenting opportunity without benefit of a hearing and relying instead on

impressions gleaned from information imparted off the record, the trial court became a driving force in the deterioration of the parent-child relationship.[1]

Aside from the fact that basic due process principles mandate a hearing before a parent's right to the custody of her children is withdrawn, perhaps another reason that our law requires an evidentiary hearing before a custodial change stems from the power of first impressions. The facts alleged in Father's emergency motions portrayed Mother as a dreadfully unstable harridan who constantly placed her children at substantial risk of physical and mental harm. This was effective advocacy, but proved far from true.

The extensive hearings eventually conducted consume more than 1,000 transcript pages. The process of taking testimony started in March 2018 and continued sporadically for the next six months. An enormous amount of evidence was gathered, much of which described events that occurred well *after* father's emergency change of custody motions had been granted. The initial legal questions concerning the children's established custodial environment were lost in the ensuing evidentiary abyss.

That is why *timely* evidentiary hearings play a vital role in evaluating the need for a custodial change. As this case epitomizes, there is a natural danger that the *first* message received, especially when bombastic or shocking, will retain a disproportionate impact on a judge's ultimate opinion.[2] Negative first impressions can create long-lasting, unshakeable biases and prejudices (also known as confirmatory bias). Therefore, the taking of actual evidence, under oath and subject to cross-examination, is critical before life-changing judgments are rendered.[3] After all, once a

---

[1] The lead opinion takes issue with using the term "ex-parte" to refer to the substantive conversations the trial court had concerning Mother with Family Court personnel. This is much ado about nothing, as conventionally the term is used in our caselaw to describe such communications. See *In re HRC*, 286 Mich App 444, 451; 781 NW2d 105 (2009) ("An in camera interview is an ex parte communication that occurs off the record in a judge's chambers and in the absence of the other interested parties and their attorneys.").

[2] "Impression formation is often subject to a primacy effect, when early information has a disproportionate influence on judgements . . . . The disproportionate influence of first impressions is one of the most robust and reliable effects distorting such judgments." Forgas, *Can Negative Affect Eliminate the Power of First Impressions? Affective Influences on Primacy and Recency Effects in Impression Formation*, 47 Journal of Experimental Social Psychology 425, 425, 427 (2011). See also Garner, *The Psychology of Credibility: First Impressions Endure, Even in Brief Writing*, 101 ABA Journal 24 (May, 2015).

[3] "Confirmatory bias" is "the desire to identify data that support an initially developed hypothesis." "[C]onfirmatory distortion" involves "overconfidence in the accuracy of one's initial hypotheses," which leads to an intentional selection of data "to be considered and to be reported." Martindale, *Confirmatory Bias and Confirmatory Distortion*, 2 Journal of Child Custody 31, 44 (2005).

court peremptorily changes a child's established custodial environment, is it surprising that *15 months* later the court will reaffirm that it did the right thing?

I cannot regard the trial court's initial legal error as "harmless," as its consequences flowed into its final decision and poisoned the well. Not only were the children removed from Mother's home; before depriving Mother of *any* contact with her children, Mother was prohibited from seeing them except under supervision, a decision made before the court heard from any health professionals. The message this arrangement sent, even to a 13-year-old, is unmistakable: something is terribly wrong with Mother. And for a 13-year-old girl at war with her mother anyway, the trial court's ruling was an invitation to continue and escalate the conflict. As Father readily admitted, in his house there are no rules.[4] It does not take a degree in child psychology to understand what every parent knows: teenagers prefer making their own decisions and running their own lives to having a parent enforce familial law and order. Or, as the court-appointed psychologist later put it: "All teenagers are rebellious." This characterization is particularly apt when it comes to cell phones and social media, which are at the heart of this case.

The concurring opinion stresses that decisions involving parenting time and custody are shielded from exacting review by the abuse of discretion standard, that the trial court saw and heard the witnesses while I did not, and that my review of the evidence is "one-sided." The questions at the heart of this case, however, are *legal* rather than factual. The court ignored the rules governing the process the Legislature created for requested parenting-time and custody changes. The distorted process created a distorted result—findings inextricably tainted by later events.

The concurring opinion insists that "it is impossible for an appellate court to disregard a trial court's finding that one of the party's testimony 'vacillated between laughing, crying, tense, and calm seemingly independent of anything occurring in the courtroom.' " I have no reason to dispute the trial court's personal interpretation of Mother's demeanor. The trial court described Mother's deportment when Mother testified in a courtroom many months after she had lost her right to parent her children. During those intervening months, Mother had been repeatedly described as crazy by Father, and characterized as desperately in need of intense mental health

---

[4] At trial, Father testified:

*Q.* What rules does [IDO] have in your household?

*A.* I mean I don't have rules.

\* \* \*

*Q.* What kind of rules do you have regarding Xbox usage for [GDO]?

*A.* I don't have rules. He's responsible for his playing time.

intervention both by Father and the trial court. Every motion Father filed further humiliated and debased her.

I assume that the trial court's description of Mother's testimony was accurate. Who wouldn't feel desperately sad and intensely anxious under the circumstances, especially given that the trial court had already telegraphed its impression that Mother was nuts? Mother's demeanor as a witness in the spring of 2018, however, has no bearing on whether proper cause or changed circumstances existed in November 2017. Too much poisoned water had flowed over the dam. That Mother had an argument with IDO and that IDO behaved poorly and ran away does not does not supply clear and convincing evidence that a modification of custody or parenting time was warranted. That Mother yelled at the IDO on a few memorable occasions and took away her cell phone does not rise to the necessary level of life-effecting, significant change.[5]

Aside from improperly depriving Mother of custody and parenting time in November 2017—an error the lead opinion acknowledges, characterizes as "clear," but brushes aside—the evidence does not support the trial court's best-interest findings. The trial court's opinion has a decidedly agitated tone, bordering on hysterical. It portrays Mother as a source of "wildly misleading and nonsensical testimony" who behaves in a "juvenile, harassing, and utterly bizarre" fashion, and is "physically and emotionally abusive." According to the trial court, Mother's behaviors are so "unconscionable" that the court "question[s] her morality."

Two mental health professionals evaluated Mother. Neither characterized her in a manner even remotely consistent with the trial court's description, and neither found that she posed a danger to her children. A few examples of the court's "fact finding," detailed below, illustrate the disingenuous manner in which the trial court approached its role. Rather than evaluating the evidence in a neutral fashion, the judge demonstrated animosity toward Mother that it made no effort to disguise. This animosity, in my view, cannot be turned on and off like a light switch. The trial court's opinion is dripping with anger and hostility, and it is impossible to expect that sometime in the future, the court will magically remove those views from its mind.

The lead opinion holds that in addition to improperly altering the children's established custodial environment without holding a hearing, the trial court committed several additional legal errors. I agree. I respectfully disagree with the lead opinion's conclusion that all of the circuit court's errors are "harmless." The most egregious error was committed at the outset, when the court changed the children's established custodial environment without a hearing. This error was far from "harmless," for the reasons discussed above and in more detail throughout this opinion. But the other errors were far from benign. As the lead opinion acknowledges, the trial court

---

[5] The concurring opinion's ode to the abuse of discretion standard is misplaced for a second reason. My criticisms of the trial court spring primarily from the trial court's inaccurate and unsupported fact finding. That task is not reviewed for an abuse of discretion. "[A] court's discretion in weighing the evidence regarding a particular factor is not unlimited; rather, it must be supported by the weight of the evidence." *Fletcher v Fletcher*, 447 Mich 871, 881; 526 NW2d 889 (1994). Regardless of the number of pages the trial court put into its effort to permanently deprive Mother of custody and parenting time, its findings of fact had very little to do with the actual evidence.

wrongfully prevented disclosure of the Friend of the Court (FOC) reports; improperly admitted and relied on text messages submitted after the close of the evidence, improperly denied Mother's request for the raw data underlying Dr. Green's report; and improperly limited Mother's cross-examination of Dr. Green. These errors combined to hamstring Mother's ability to defend herself at the trial. I would add to that list the following: after improperly and injudiciously removing the children from Mother's physical custody and terminating her parenting time, the court utterly failed to expedite the matter. As a result, a four-month delay ensued before the required custody hearing even commenced. The hearing itself stretched over eight months. And it took the court three more months to write an opinion. All the while, Mother was prevented from visiting with or even contacting her children.

Singularly and in combination, the trial court's errors warrant reversal.

II

My elucidation of the harmful impact of the trial court's rulings requires a brief review of the background facts. The parents never married or lived together. Mother had sole physical custody of the parties' twin children until the 2017 order at the center of this case. Father had liberal parenting time. The parties occasionally quarreled about parenting time issues between 2004, when the children were born, and 2017. But no major changes were made. Mother retained sole physical custody.

The events culminating in the court's order began with a July 2017 "sleepover" at Mother's home. Sometime after midnight, Mother discovered that 13-year-old IDO and the girl's friends had covered the dining room with shaving cream so that they could "skate" in it. Mother lost her temper and shouted at the girls. She used profanity. IDO was embarrassed and angry.

IDO's relationship with Mother was already on thin ice due to their conflicts regarding cell phone usage and social media rules. A month or so before the shaving cream debacle, Mother had asked Father for the passwords for the cell phones Father had purchased for the children. Father replied: "I don't have passwords. They do." Mother repeatedly expressed concerns about IDO's use of Instagram and other social media applications. Both Father and IDO rebuffed her. Yet Mother's concerns were not unfounded. In early September 2017, Mother found the following text messages on IDO's phone: "How old r u;" "Your cute and I wanna seem them nudes mama;" "Dont tell me what to do bby girl." Mother was also concerned about her son's frequent use of violent content on his XBox, and attempted to put herself on the account to monitor his use of it.[6]

---

[6] This Court recently highlighted the dangers of uncontrolled social media use by teenagers. *In re JP*, __ Mich App __; __ NW2d __ (Docket No. 344812, 2019). In this case, the trial court was "shocked" that Mother added herself to her son's XBox account, in part because doing so "publicly humiliated" the 13-year-old. I suggest that a parent has a right to add herself to a gaming account and that courts should tread very carefully before implying otherwise. Parents frequently make "oversight" decisions regarding their children's social media and internet experiences. Judicially faulting a parent for doing so is concerning.

Strife between Mother and her 13-year-old daughter escalated in late August 2017, when Mother denied the girl's request to go to a friend's house. IDO defied her mother and left anyway. Mother followed in her car as IDO walked or ran through the neighborhood. When Mother was able to confront IDO at a neighbor's home, she asked IDO to hand over her cell phone. IDO refused. Mother reached around the child from behind and took it from her.

During her flight, IDO sent her father a stream of text messages, including: "Mom wouldn't let me leave so I just [ran] away again. Being in that house is making me go crazy. . . . She's following me in her car. . . . I can't control what I say to her I just keep screaming. . . . I don't want to stay at moms anymore seriously[.] She scares me and she makes me go insane[.] Like I can't control myself anymore. . . . It didn't hurt but she wrapped her arms around me and throwing me around to get my phone." Father called the police. This event featured prominently in his emergency motion to change custody and to immediately suspend Mother's parenting time.

When the responding officer finally testified *seven months later*, he described the situation as nonemergent, "just an argument," and Mother as "polite" and respectful. When asked about Mother's mental state he testified: "I haven't seen Ms. D'Annunzio act in a way that would give me any type of impression that she is crazy. My conversations with her have been brief and to the point."[7]

In August 2017, Father withheld the children following the end of his parenting time, and Mother filed an emergency, ex-parte motion, pro se, to enforce the court's order. The trial court instructed her to praecipe the motion for a motion call and to serve Father. Father then filed a motion seeking an emergency hearing, a change of custody, and "an independent psychological exam of Mother." Father's allegations included the following:

- "[T]here is a long history of instability in Mother's life and it has escalated dramatically in the very recent past;"

- "The children are now unsafe and in a state of complete emotional upheaval fleeing Mother's residence regularly;"

- "It is believed that her ex-husband will testify as to her volatility and frightening behavior towards the children, especially their daughter. Unfortunately he is no longer in the home to help protect the children."[8]

---

[7] Father called the police again a few days later to report that Mother was allegedly videotaping him while he walked his dog. That officer agreed under oath (seven months later) that Mother was appropriate, not rude, and that the officer had no reason "to question her mental health."

[8] Rather than waste pages discussing the ex-husband's testimony in any detail, suffice it to say that this allegation proved 100% wrong. The ex-husband testified to exactly the opposite: that Mother had a good relationship with the children while he was around, and asserted: "I thought she was a good mother. . . . [S]he was very loving and cared for her children, looked after them." He

-7-

- "Mother has a history of losing her temper beyond the point of control. Father believes that Mother suffers from a psychological condition making it impossible for her to control her behavior. There are recordings of her screaming at the children that illustrate Mother's inability to control herself. It can only be classified as rage."[9]

The trial court referred the matter to an FOC referee, who apparently recommended approximately equal parenting time (the report is not in the record). The trial court rejected this recommendation, despite that counsel had reached an agreement that Mother would be involved in parenting the children. The trial court rejected that agreement as well, announcing that the children's reactions were "not normal" and that they might not "do very well" if forced to visit with their mother.

In making its decision, the trial court relied heavily on information provided off-the-record by Kathleen Doan, whom the court identified as "my family counselor." Doan met with the parents twice and the children once. She then communicated verbally with the court and wrote a brief letter to the court describing Mother as "rude and confrontational." Moreover, Doan asserted that "[b]ased on information I have received from Children's Protective Services [CPS], School Counselor from Bloomfield Hills Middle School, information provided by parents and personal observations of [Mother's] behavior, I am recommending she have a complete psychological evaluation and take parenting classes." Doan further recommended that the court grant Father sole legal and physical custody of the children, and indefinitely suspend Mother's parenting time.

Remarkably, Doan never testified at the beginning of these proceedings, or during the lengthy trial. Her opinions were never subjected to cross-examination. But their underpinnings were examined in great detail. The CPS worker did not support Doan's view of the situation, and neither did the school counselor. Again, this is why the law (and basic due process principles) require hearings in open court and eschews hearsay-driven decision making. The lead opinion papers over with a stamp of "harmless" both the court's violation of the law and the fact that if gathered in November 2017, the evidence would have shredded Doan's conclusions and exposed her bias. By relegating the trial court's errors to the realm of the inconsequential, the lead opinion invites the trial court to do it all again.

---

believed the children were "safe" with Mother and never witnessed any "frightening" behavior when the children were present." He read into the record a letter he wrote in which he stated: "I can honestly say that her relationship with the children . . . could be characterized as very normal."

[9] Father works at a landscaping company and possesses no degrees or training in any relevant mental health discipline. He has insisted throughout the proceedings (without expert support of any kind) that Mother suffers from "borderline personality disorder," cannot "control her temper in any way," "there's some type of personality disorder that causes her not to be rational and react in ways that are frightening," and that she needs a new psychiatrist and a different therapeutic approach. Based on these perceptions, he believes that his children's "fears" of their mother are "rational." None of the professionals who have examined Mother share his views or his "diagnoses."

-8-

# III

The 1,000 pages of transcript detail (among other things) virtually every disagreement between IDO and her mother between August and November 2017. The record is replete with copies of emails and text messages between the parties and the therapists. Multiple motions flew back and forth, one more histrionic than the last. Several expert witnesses from various disciplines became involved.

There can be no doubt that Mother occasionally lost her temper and shouted at IDO. Their relationship was strained, largely due to their conflict over cell phone and social media use. Parents should not yell, scream, or swear at their children. But sometimes, they do. Good parents, overwhelmed with the stress of parenting, may yell, scream and swear. But occasional episodes of yelling, screaming and swearing do not provide a rational basis to deprive a parent of her child's custody. Period. As this Court put it recently:

> A parent that yells and swears at his or her child, stands over them, and invades their personal space, can fairly be characterized as a less than ideal parent. But that fact standing alone does not prove a parent's unfitness under MCL 712A.2(b) because it is insufficient to show that there is "a substantial risk of harm to [the child's] mental well-being." Nor does it establish that the child's home environment is an unfit place because of the parent's neglect, cruelty, drunkenness, criminality, or depravity so as to allow the court to assume jurisdiction under MCL 712A.2(b)(2). Something more than yelling and swearing is necessary to prove parental unfitness. [*In Re Kellogg*, __ Mich App __; __ NW2d __ (Docket No. 349930, 2020), slip op at 4.]

Mother never physically harmed her children in any way. More importantly, none of the therapists who actually examined Mother supported that she posed any danger to her children. This central fact was utterly ignored by the trial court, which found to the contrary despite that the evidence did not support denying mother all parenting time. And here is the larger point. Mother yelled, screamed, and appeared to her daughter as insensitive. In retrospect, she may have said things she should not have—what mothers haven't? But none of Mother's parenting "crimes" (most of which stemmed from her desire to police her children's use of their devices) warrant the punishment she has endured.[10]

The trial court determined that Mother was emotionally unstable and that due to her instability, she is "physically and emotionally abusive." These findings serve as the unifying theme of the court's best-interest findings. The court further determined that any parenting time with Mother would "endanger the [children's] physical, mental, or emotional health." The testimony does not support these conclusions. Further, the trial court's recapitulation and summary

---

[10] For example, I find it incomprehensible that Mother could be faulted for following her daughter by car as the child fled Mother's home. There is no evidence whatsoever that this endangered the child. I can only imagine how Mother would have been punished if the child had been injured or harmed in her flight and Mother had done nothing to stop her.

of the evidence was disingenuous at best. A review of the evidence supports that the trial court made up its mind at the outset of the proceeding and simply disregarded that the bulk of evidence—particularly that provided by professionals—contradicted the court's preferred narrative.

My review focuses on two areas: the evidence that would have been available had the trial court conducted an evidentiary hearing when it should have, and the evidence subsequently gathered by mental health professionals.

A

The three somewhat disinterested witnesses who could have enlightened the court before it took peremptory action were Aaron Sparks, the police officer involved in IDO's running-away escapade, Kari Sweeny, who responded after several other police contacts, and the CPS worker who investigated the situation shortly thereafter.

The trial court's review of Sparks' testimony recites that Father had called for police assistance, reporting to the dispatcher that a child "had walked away from their mother's home." When he arrived at the home of one of IDO's friends, Sparks found IDO crying and concluded "that she was upset with mother to the extent that [IDO] needed to walk away to deescalate the situation." The two had engaged in a " 'brief struggle' over a phone," the court wrote, and Mother had "closely followed behind [IDO] while she walked away from mother's home." According to the trial court's summary, Sparks expressed that IDO's "fear seemed rational given the circumstance."

The information the trial court omitted included Sparks' opinion that: this was "just an argument;" there was no cause to report anything to CPS he never saw Mother "act in a way that would give me any type of impression that she is crazy;" she was "respectful;" and that all of Sparks' "opinions" about what had happened that day were drawn solely from talking to Father (who was not present and did not witness the events) and IDO. In Sparks' estimation there was no reason that the other child, GDO, could not remain with his mother.

It is difficult to understand why the police were called to respond to an argument between a mother and her 13-year-old daughter. It is even more difficult to understand how this event could generate a legal basis to deprive a mother of her child's custody, given that parents have a right (and a duty) to follow their runaway children. That IDO was upset after an argument is understandable, but nothing in Sparks' testimony supports that IDO's decision to run away was either justified or deserving of official approval.

A second police officer, Kari Sweeney, was involved in three other police contacts that Fall: one initiated by Father, and two by Mother. The trial court's opinion discusses the first, initiated by Mother after IDO ran away a second time following an argument about cell phones (and given that there were no negative consequences for IDO the first time, why not run away again?). When Sweeny located the children at Father's home and spoke with IDO, the court's opinion declares, Sweeny "stated that [IDO] appeared upset, and seemed fearful of mother, during her interview. Officer Sweeny stated that [IDO]'s fears seemed rational."

On cross-examination, however, Sweeny admitted that she observed no reason that IDO should have felt unsafe with her mother, and that based on her investigation she had no reason to credit IDO's fear with any "veracity," despite Father's statement that "something could be off mentally" with Mother. The trial court also neglected to mention that Sweeny testified that Mother was never rude, her emotions were appropriate, and that during their interactions Sweeny never had a reason to question Mother's mental health. Sweeny also agreed that she detected no reason for the children to fear that their mother would physically harm them, and discerned no basis to contact CPS. Rather, Sweeny affirmed that Mother always presented as "a concerned mother" who "loved her children." Sweeny testified that she had no concerns that Mother's "reactions to the situations were inappropriate."

The next person who could have weighed-in during a timely hearing was Jessica Spigner, the CPS worker who responded to a complaint for investigation received in October 2017. Here is what the trial court wrote regarding Spigner's testimony:

> She stated that the allegations against mother involved physical abuse, such as using her vehicle to run over [IDO], improper supervision, and emotional abuse. Ms. Spigner testified that she did not substantiate the physical abuse or improper supervision allegations, because the children were placed with father at that point, **but that she would have substantiated the emotional abuse allegations had the children stayed with mother**. [Emphasis in original.]

Spigner's actual testimony does not comport with this portrayal:

> *Q.* And did you interview the minor children?
>
> *A.* I did.
>
> *Q.* And did you observe the conditions of mom's household?
>
> *A.* Yes, both parents' household.
>
> *Q.* Okay. And how was mom's household?
>
> *A.* Mom's household was appropriate.
>
> *Q.* Okay. Do you know specifically what the allegations were with regard to mom?
>
> *A.* They were [sic] a cell phone was involved. Mom was going to run the daughter over with the vehicle. Trying to jog my memory completely back. I did review.
>
> *Q.* What --
>
> *A.* And that there was like a physical abuse that mom pushed her daughter about a few months ago.

*Q*. Okay. And when – after you're completing your investigation were you able to substantiate any of the complaints?

*A*. I was not able to due to that the children were placed with dad.

*Q*. Okay. Did you . . . make a finding that . . . mom had tried to run over the child with a car?

*A*. I did not.

*Q*. Did you make a finding that mom had perpetrated any physical abuse against the child?

*A*. No.

\* \* \*

*Q*. And just to clarify, you're not saying that if the children had remained with mom that you were going to substantiate, is that what you're testify to today?

*A*. If they were to remain with mom we would have had an open case, so yes we would.

*Q*. You would have substantiated?

*A*. Yes.

*Q*. And what would you have substantiated for?

*A*. More so of a mental injury, emotional abuse.

*Q*. But isn't it true that the child's treating counselor would not sign off on there being a mental injury in this case?

*A*. She would not send the paperwork, but she did a verbal, but yes.

*Q*. Isn't it true though she would not?

*A*. She would not.

*Q*. She would not. So what would be the basis for your, your report then?

*A*. For to have – to be with mom it would just basically have services put in so that it would be able to benefit mom and the children so they can communicate better.

*Q*. Okay.

*A*. So there's not another issue.

-12-

*Q.* Okay. So you were – your conclusion was that the parent, that mom and the child were having – and the children were having communication issues?

*A.* Yes, it seemed like that.

* * *

*Q.* Were the communication issues only mom's fault?

*A.* I can't say yes or no to that. I'm sorry.

*Q.* What would have been your recommendations if the children had still been placed with [Mother]?

*A.* We would have provided services.

*Q.* What kind of services are you speaking of?

*A.* In-home services, parenting, have providers come to the home once a week to work on communication and basically keep the children in therapy.

Notably, Spigner did *not* testify that she found any ground for removing the children from their mother's care and custody, and nothing in her testimony is consistent with her having so recommended. Rather, Spigner offered that if the children had stayed with Mother, she would have recommended "services" to improve "communication." Obviously, Spigner had no concern that the children would be in any danger in Mother's home. Moreover, the trial court's characterization of this testimony as "substantiation" of "mental abuse" is legally incorrect.[11]

The CPS Field Guide provides that "[a] preponderance of evidence of mental injury can only be found if a mental health practitioner outside of DHS either diagnoses a psychological condition or determines that the child is at significant risk of being psychologically or emotionally injured/impaired resulting from the parent or person responsible's actions." Department of Human Services, *Field Guide: Children's Protective Services Investigations*, DHS Pub 108 (October 2008), p 27. Spigner's admission that the "child's treating counselor would not sign off" means that Spigner could not have substantiated mental abuse even if she had wanted to do so.[12]

Given the testimony of these three witnesses, I am hard pressed to find any evidence, let alone clear and convincing evidence, that Mother posed a danger to her children. It is certainly

---

[11] Remarkably, the trial court understood this point at the hearing. In response to an objection to a question posed by Mother's counsel, the trial court stated: "Well I think she testified that . . . she didn't substantiate and they put no services in the home[.]"

[12] Spigner's notes, which she read into the record, reference a conversation Spigner had with the children's then-therapist, Dr. Sucher. Spigner claimed that Dr. Sucher verified mental abuse on the phone, but admitted that Dr. Sucher refused to do so in writing. Dr. Sucher never testified, and her notes are not part of the appellate record.

-13-

apparent that Mother and IDO did not get along. Therapy and communication "services" were warranted. Their disagreements, however, did not give rise to a legitimate basis for stripping Mother of both physical and legal custody and all parenting time.

B

The trial court's final opinion and order reflect a conclusion that Mother is seriously mentally ill. Indeed, the court expressed that any parenting time with her would "endanger the children's physical, mental or emotional health." The trial court reached these conclusions by disregarding the testimony of the mental health professionals who actually evaluated Mother. The great weight of the evidence preponderates in the other direction: that Mother's psychiatric diagnoses do not call into question her ability to safely parent her children.

Two mental health professionals provided testimony regarding their evaluations of Mother. Dr. Bering, the children's pediatrician, also testified as an expert, although he has never formally evaluated Mother psychologically. For years, however, he observed first-hand her interactions with her children.[13] The testimony of the other professionals is important for two reasons. First, the experts who have examined Mother provided the most reliable evidence of her mental and emotional conditions. Second, a prodigious amount of testimony was supplied by the children's therapist, Katrina Popovic. Popovic admitted that she never established a therapeutic relationship with Mother. She ultimately admitted that she harbors a bias against Mother, believes Mother to be mentally unfit, and confirmed that the children share that view. Popovic recounted that the children "have made it quite clear that [IDO] was pretty vocal about it in our last session that if [Mother] were to agree to pretty intensive therapy and possible medication, anything to help her that help them [sic] that she would be more open to establishing a relationship with her."

Although Popovic agreed under cross-examination that she did not think it was "right" for the children to "dictat[e]" their mother's therapy, the trial court embraced the underlying concept. The court opined that Mother has "little desire to be a parent," and that her "intentionally antagonistic, spiteful, and emotionally damaging behavior inflames the interpersonal conflict she has with father and also the relationship she has with the children." The court's opinion quotes at great length from Popovic's notes, concluding: "[t]he court simply cannot find mother's bizarre actions to be logical or designed to further the best interests of her children." The court concluded that mother's future parenting time is contingent on the *children's* desire "to reinstate contact" and whether reinstating contact would be in their best interests.

---

[13] Dr. Bering also evaluated the children at the request of CPS. Almost a year later when he testified, Dr. Bering emphasized that his notes did *not* reflect that Mother had caused a mental injury to her children. Dr. Bering advised the court that if he had detected a mental injury, he would have noted it. He explained that it is common for 13-year-old girls to have disputes with their mothers, particularly over cell phone use, and affirmed that after examining the children he had no reason to believe that contact between Mother and her children would have endangered their mental or physical health.

-14-

The testimony of the mental health experts best positioned to evaluate Mother's mental health paints an entirely different picture.

Dr. Scott Allen has been Mother's treating psychiatrist since 2013, and has seen her on a regular basis since then. He testified that Mother has attention deficit/hyperactivity disorder, major depression recurrent and in partial remission, and post-traumatic stress disorder (it bears mention that Mother was undergoing treatment for Stage III breast cancer throughout the time of these events). Dr. Allen's treatment consists of psychotherapy and several medications. He testified that he has observed in Mother "no evidence of physical violence or intent to do or wish to do so to any other person," and never detected that she would pose a threat "either emotionally or physically to her children." Although Mother has a "strong personality" and sometimes speaks "intently and intensely," she has never come "close" to yelling at him. His impression of her parenting style is that "she sets limits and that there are consequences when the boundaries or limits are overstepped." Dr. Allen never detected any fabrication on Mother's part and concluded that she had no psychiatric impairment that would affect her ability to parent her children.

Pursuant to a court order, Mother was also evaluated by Dr. Linda Green, a psychologist employed by the Oakland County FOC. Dr. Green testified that she found Mother "well controlled, motivated, [and] invested" during the evaluation. She never raised her voice, did not express anger, and Dr. Green found Mother to have been "honest" with her. Dr. Green administered a number of tests and interviewed Mother at length. She testified that she did not diagnose any mental illness.

In Dr. Green's view, Mother sometimes "has difficulty modulating her response to conflict particularly when it involves her family and her children," and "at those times has been known to have exaggerated responses." That information, Dr. Green explained, derived from reports written by other people, and was not based on her own evaluation. Dr. Green herself did not observe any behavior outside the norm, and agreed with Dr. Allen that Mother suffered from no psychiatric impairment in her ability to parent her children. According to Dr. Green, Mother is motivated to resolve the conflict with her children. While the trial court concluded that virtually every child custody factor favored or strongly favored Father, Dr. Green determined that the factors only "slightly favor the father." Nothing in her testimony supports that immediate efforts at reunification, conducted by a professional, would be dangerous or unwarranted.

IV

Because Mother's parental rights have not been terminated and there exist no grounds to even seek court jurisdiction, immediate efforts should be made to reunify her with her children. According to the trial court's order, periodic "review hearings" may be scheduled " 'to determine whether the children wish to reinstate contact with defendant and whether resumption of parenting time would be in their best interests.' "

Conditioning reunification on the children's willingness to "reinstate contact" is, in my view, plain error. Children are not emotionally or intellectually capable of being assigned the role of parenting-time gatekeepers and under no circumstances should be granted this power.[14]

The record before this Court substantiates that neither child currently has any relationship with Mother of any kind. IDO expresses loathing, anxiety and fear toward her. Although the trial court found that Father is willing to facilitate a relationship, neither of the children has reached out to Mother in more than two years. This is unsurprising, at Father's trial testimony substantiates that on several occasions before the court's order entered he deliberated withheld the children from court-ordered visits because they allegedly did not want to go, and has never told them that they should reach out to their mother. The record reflects that Father is not facilitating anything except maintaining the distance, physical and emotional, between Mother and her children.

At this point, the children are allied with Father and both are alienated and estranged from Mother. Continuing on this path will only worsen the situation. The trial court refused to appoint a new family reunification therapist in February 2019, and nothing in the court's opinion suggests that it would be willing to do so now. Because the trial court has repeatedly expressed its view that Mother is incapable of parenting her children safely and has conducted these proceedings with no apparent respect for rules protecting Mother's rights, reassignment is required:

> When determining whether remand to a different judge is required, we examine the following factors:
>
> > (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness. [*People v Walker*, 504 Mich 267, 285-286; 934 NW2d 727 (2019), quoting *People v Hill*, 221 Mich App 391, 398; 561 NW2d 862 (1997) (quotation marks and citations omitted in original).]

Here, reassignment is required both to preserve the appearance of fairness and to provide the children and their Mother an opportunity for reunification.

In its haste to punish Mother, the trial court wound up worsening a bad situation. Following the rules may not have automatically healed the parties' problems, but based on the evidence that ultimately emerged, Mother's relationship with her children would have been preserved. The goal

---

[14] See also our Supreme Court's order in *Ludwig v Ludwig*, 501 Mich 1075; 911 NW2d 462 (2018), wherein the Court struck down an order leaving to "the unfettered discretion of the [children's] therapists the 'frequency, duration, and method' of any contact" between the children and their father. Placing that power in the hands of the children at the center of this case, or their father, is even more improper.

at this point should be immediate and aggressive efforts at reconciliation and reunification.  Given the lead opinion's willingness to simply overlook the trial court's many errors and its endorsement of the status quo, I hold out no hope that will occur.


/s/ Elizabeth L. Gleicher